

FILED

APR **3 0** 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of an Application to<br>Enforce Administrative Subpoena of the<br><br>U.S. Commodity Futures Trading Commission,<br><br>Applicant,<br><br>v.<br><br>The McGraw-Hill Companies, Inc.<br><br>Respondent. | )<br>)<br>)<br><br>Case: 1:07-mc-00169<br>Assigned To : Urbina, Ricardo M.<br>Assign. Date : 4/30/2007<br>Description: MISC.<br>)<br>)<br>)<br>)<br>) |

**APPLICATION FOR AN ORDER
TO SHOW CAUSE AND AN ORDER REQUIRING
COMPLIANCE WITH ADMINISTRATIVE SUBPOENA**

**JURISDICTION AND VENUE**

1.       Applicant U.S. Commodity Futures Trading Commission ("Commission") is an

independent federal regulatory agency responsible for administering and enforcing the provisions

of the Commodity Exchange Act ("Act"), *as amended*, 7 U.S.C. §§ 1.1 *et seq.* (2002) and the

Commission's Regulations ("Regulations"), 17 C.F.R. § 1.1 *et seq.* (2006).

2.       The Commission submits this Application for an Order to Show Cause and an

Order Requiring Compliance with Administrative Subpoena issued to, and served upon, The

McGraw-Hill Companies, Inc. ("McGraw-Hill") on December 15, 2006 in the form of an

administrative subpoena *duces tecum* as part of an ongoing non-public investigation being

conducted by the Commission.

3.       The Commission submits this application pursuant to Section 6(c) of the Act, 7

U.S.C. § 15.  Venue is proper in the District of Columbia because the attorneys and investigators

from the Commission's Division of Enforcement ("Division") who are working on the

investigation are assigned to the Washington, D.C. office; the documents relating to the

investigation are stored in the Washington, D.C. office, and the subpoena served on McGraw-

Hill was issued from and is returnable to Washington, D.C.

## RESPONDENT

4.    On information and belief, the McGraw-Hill Companies, Inc. has a principal

place of business at 1221 Avenue of the Americas, New York, New York 10020. McGraw-Hill

operates Platts, a self described "world leader in providing energy information." Platts has

offices and transacts business in Houston, New York, and Washington D.C.

## THE ADMINISTRATIVE SUBPOENA

5.    On December 1, 2006, the Commission issued a formal order of investigation

entitled "*In the Matter of [Energy Company and its affiliates]*" ("Order"), pursuant to Sections

6(c) and 8(a)(1) of the Act, 7 U.S.C. §§ 15 and 12(a)(1) (1994), designating Division staff

members to subpoena witnesses and compel their attendance, administer oaths and affirmations,

take evidence, and require the production of any books, papers, correspondence, memoranda,

records and other tangible things relevant or material to an investigation being conducted

pursuant to Sections 6(c) and 8(a)(1) of the Act.[1] *See* Declaration of Kathleen M. Banar in

Support of Application for an Order to Show Cause and an Order Requiring Compliance with

Administrative Subpoena at ¶ 4 and Exhibit 1 attached thereto.

---

[1]    "Energy Company" is a United States-based energy marketing company. As discussed more fully in the accompanying *Memorandum of Points and Authorities in Support of An Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena*, the Commission is investigating potential violations by the Energy Company of the anti-manipulation provisions of the Commodity Exchange Act. 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2002). The investigation is non-public. Therefore, the identity of the Energy Company and its affiliates, along with a recitation of the evidence pertinent to ruling on this Application, are disclosed only in the accompanying Declaration of Kathleen M. Banar ("*Banar Declaration*") submitted herewith *under seal*.

6.    The Order authorized Division staff to issue subpoenas and take testimony for purposes of determining whether the Energy Company or any related person, firm or entity has engaged, is engaging, or is about to engage in acts or practices in violation of the Act or its regulations. *Id.*, Exhibit 1.

7.    The Commission is conducting a non-public investigation into whether Energy Company manipulated or attempted to manipulate the price of natural gas in violation of Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), *as amended*, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2002).

8.    McGraw-Hill, through its division Platts, compiles and calculates monthly natural gas price indices from natural gas trade data submitted to Platts by energy marketers, like Energy Company. Platts includes those price indices in its monthly *Inside FERC Gas Market Reports* ("*Inside FERC*").

9.    As set forth in the *Banar Declaration*, during the course of this investigation, the Division has received evidence demonstrating that Energy Company's natural gas traders may have manipulated or attempted to manipulate the price of natural gas at particular natural gas delivery hubs to benefit Energy Company's financial positions tied to the monthly *Inside FERC* index price. The Division is also investigating whether or not Energy Company engaged in similar misconduct during particular time periods in 2003, 2004, and 2006.

10.    As set forth in the *Banar Declaration*, the Division has evidence that Energy Company voluntarily submitted information regarding Energy Company's natural transactions ("trade data"), including price and volume information, to Platts for use in calculating the *Inside FERC* index, from approximately the spring of 2003 through the present time.

11.    As set forth in the *Banar Declaration*, the Division has evidence that Energy Company knew that the trade data it submitted to Platts could be used in Platts' calculation of the *Inside FERC* index and that its trade data could impact Platts' calculation of the price index.

12.    On December 15, 2006, pursuant to the Order, the Commission issued a subpoena *duces tecum* ("Subpoena") to McGraw-Hill seeking, *inter alia*, production of trade data Energy Company traders delivered to Platts, and McGraw-Hill's documents concerning Platts' use of that data in the indices which it calculates.  The Subpoena required McGraw-Hill to produce documents on December 22, 2006 at the Commission's Washington, D.C. office.   A true and correct copy of the Subpoena is attached as Exhibit 6 to *Banar Declaration*.

13.    The documents the Commission seeks are directly relevant, *inter alia*, to determining the universe of trade data the Energy Company submitted to Platts for use in calculating the index, and documents reflecting what trade data was used and how it was used by Platts to calculate the *Inside FERC* index.

14.    On January 12, 2007, McGraw-Hill served on the Commission *The McGraw-Hill Companies, Inc.'s Responses and Objections to Subpoena Duces Tecum* ("Objections").  *Banar Declaration*, at Exhibit 7.  In its objections, McGraw-Hill refused to produce certain categories of responsive documents, claiming that those documents are protected by the qualified "reporter's privilege" recognized in this circuit.

15.    McGraw-Hill asserts this objection notwithstanding that the documents requested in the subpoena *duces tecum* to essentially mirror those documents that this court already has held Platts' must produce in response to Commission subpoenas to Platts in other similar investigations.  *See, e.g., see CFTC v. The McGraw-Hill Companies, Inc.*, 390 F. Supp.2d 27

4



(D.D.C. Oct. 4, 2005); *CFTC v. Whitney*, 441 F. Supp.2d 61 (D.D.C. July 25, 2006). *See also CFTC v. Bradley, et al.*, No. 05-CV-62-JHP-FHM (N.D. Ok. June 16, 2006).

16.    As set forth more fully in the Commission's *Memorandum of Points and Authorities in Support* submitted herewith, the law that controls the outcome of this Application is clear. Based upon the balancing test articulated in *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981), this Court has now twice held that McGraw-Hill's claims of "reporter's privilege" must yield to the Commission's legitimate law enforcement interests, based on issues virtually identical to those presented in this Application. *See CFTC v. The McGraw-Hill Companies, Inc.*, 390 F. Supp.2d 27, 35-38 (D.D.C. October 4, 2005) (ordering McGraw-Hill to comply with the Commission's administrative subpoena because the requested materials information "goes to the heart" of the Commission's investigation and the Commission had exhausted all other reasonably available alternative sources for the information); *see also*, *CFTC v. Whitney*, 441 F. Supp.2d 61, 65-70 (D.D.C. July 25, 2006) (holding the same in the context of a subpoena to McGraw-Hill in the *Whitney* litigation, pursuant to Rule 45, Fed. R. Civ. P.)

17.    Prior to filing this Application, counsel for the Commission and counsel for McGraw-Hill conferred on a number of occasions in an attempt to resolve, or at least narrow, any dispute between them regarding the subpoenaed documents, or the manner of their production, before seeking aid of this Court. Notwithstanding these efforts, the assistance of this Court is necessary.

## **RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(1)     enter an Order to Show Cause requiring McGraw-Hill to appear before this Court on a date to be fixed and to show cause, if any, why it should not be compelled to comply with the subpoena served upon McGraw-Hill;

(2)     enter an Order requiring McGraw-Hill to comply with the Commission's subpoena; and

(3)     grant such other and further relief as may be just and proper under the circumstances.

Dated: April 30, 2007             Respectfully submitted,
       Washington, D.C.

Kathleen M. Banar (Ill. Bar No. 6200597)
Kim Bruno (D.C. Bar No. 389899)
United States Commodity Futures
Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
202.418.5000
202.418.5531 (facsimile)

## CERTIFICATE OF SERVICE

I, Kathleen M. Banar, hereby certify that on *30*, 2007 I caused a copy of U.S. Commodity Futures Trading Commission's *Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena* to be served by Federal Express on counsel for The McGraw-Hill Companies, Inc., Carolyn K. Foley, Esq., Davis Wright Tremaine LLP, 1633 Broadway, New York, New York 10019.

_____
Kathleen M. Banar

## CERTIFICATE OF SERVICE

I, Kim G. Bruno, hereby certify that on April 30, 2007, I caused a copy of Applicant's proposed *Order Requiring Compliance with Administrative Subpoena* to be served by First Class Mail on counsel for The McGraw-Hill Companies, Inc., Carolyn Foley, Esq., Davis Wright Tremaine LLP, 1633 Broadway, New York, New York 10019.

Kim G. Bruno

3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of an Application to<br>Enforce Administrative Subpoena of the<br><br>U.S. Commodity Futures Trading Commission,<br><br>Applicant,<br><br><br>v.<br><br>The McGraw-Hill Companies, Inc.,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**APPLICANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF AN APPLICATION FOR AN ORDER
TO SHOW CAUSE AND AN ORDER REQUIRING
COMPLIANCE WITH ADMINISTRATIVE SUBPOENA**

Applicant United States Commodity Futures Trading Commission ("Commission"), by

its attorneys, submits this Memorandum of Points and Authorities in Support of its Application

for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena.

**I.      INTRODUCTION**

On December 15, 2006, the Commission, through its Division of Enforcement (the

"Division"), issued an administrative subpoena *duces tecum* (the "Subpoena") to The McGraw-

Hill Companies, Inc. ("McGraw-Hill") requiring McGraw-Hill to produce information about

natural gas transactions in interstate commerce that were submitted to its division, Platts, by a

certain United States-based energy marketing company ("Energy Company").[1]  McGraw-Hill

---

[1]      A copy of the Subpoena is attached as Exhibit 6 to the Declaration of Kathleen M. Banar ("*Banar Declaration*") submitted herewith under seal.

objects to the production of certain of the responsive documents based upon the qualified "reporter's privilege"[2] recognized in this circuit.

Platts compiles and calculates monthly natural gas price indices from natural gas trade data (including price and volume information) submitted to Platts by energy marketers, like Energy Company. Platts includes those price indices in its monthly *Inside FERC Gas Market Reports* ("*Inside FERC*"). Platts' *Inside FERC* price indices are then used by energy companies, public utilities, and speculators, to price billions of dollars of natural gas transactions, for price discovery, and to assess price risks.

The Commission is conducting a non-public investigation into whether Energy Company manipulated or attempted to manipulate the price of natural gas in violation of Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), *as amended*, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2002); and whether those manipulated prices were used by Platts in calculating the index price of natural gas published in its *Inside FERC* monthly publication. As part of that investigation, the Commission issued the Subpoena requesting, among other things, the trade data Energy Company submitted to Platts for use in calculating the index, and documents reflecting what trade data was used and how it was used by Platts to calculate the *Inside FERC* index.

There is no dispute here as to what law controls the outcome of this Application. Based upon the balancing test articulated in *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981), this Court has now twice held that McGraw-Hill's claims of "reporter's privilege" must yield to the Commission's legitimate law enforcement interests, based on issues virtually identical to those presented in this Application. Indeed, in *CFTC v. The McGraw-Hill Companies, Inc.*, 390 F. .

---

[2]     McGraw-Hill objects to Document Request Nos. 1, 2, 4 and 6 of the Subpoena based upon the "reporters privilege." *See* McGraw-Hill's Objections to Subpoena *Duces Tecum*, attached as Exhibit 6 to *Banar Declaration*.

Supp.2d 27 (D.D.C. October 4, 2005) ("*McGraw-Hill I*"), Judge Lamberth considered the

Commission's application to enforce an administrative subpoena *duces tecum* served on

McGraw-Hill with respect to another energy company, which sought the same categories of

information, for essentially the same purposes as the information sought in the Subpoena. *Id.* at

31, 35-38. The Court ordered McGraw-Hill to comply with the subpoena, finding that the

requested information "goes to the heart" of the enforcement purposes articulated by the

Commission in that application; that the Commission had exhausted every reasonably available

alternative source of obtaining the information; and thus, that the Commission had overcome the

qualified privilege. *See id.,* at 34-35.[3]

       As demonstrated below, as in *McGraw-Hill I*, the information requested in this Subpoena

goes to the heart of to the Commission's investigation into whether Energy Company

manipulated or attempted to manipulate the price of natural gas in violation of Sections 6(c),

6(d), and 9(a)(2) of the CEA, and whether those manipulated prices were used by Platts to

calculate the *Inside FERC* index. Similar to *McGraw-Hill I*, the Commission has exhausted

every reasonably available alternative source of obtaining the information. Indeed, McGraw-Hill

is the *sole source* of information regarding the trade data used by Platts, and how that data was

used to calculate the index. Thus, *McGraw-Hill I* (and *Whitney)* should direct the outcome of this

Application and the documents must be produced.[4]

       Prior to filing this Application, counsel for the Commission and counsel for McGraw-Hill

conferred on a number of occasions in an attempt to resolve, or at least narrow, any dispute

---

[3]      *See also, CFTC v. Whitney*, 441 F. Supp.2d 61, 65-70 (D.D.C. July 25, 2006) (holding the same in the context of a subpoena to McGraw-Hill in the *Whitney* litigation, pursuant to Rule 45, Fed. R. Civ. P.).

[4]      *See infra,* n. 45.

between them regarding the subpoenaed documents, or the manner of their production, before seeking aid of this Court. Notwithstanding these efforts, there are three unresolved issues.

First, McGraw-Hill contends that the Commission purportedly failed to provide sufficient evidence of the Commission's confidential, non-public investigation to satisfy Platts that the Commission's need for the information "goes to the heart" of its investigation. This is not the first case in which McGraw-Hill has made such a demand. It is unreasonable for an unregulated index provider -- who for a fee, sells commodity indexes that are used for price discovery -- to also demand details of a federal government investigation. Nonetheless, given the nature of the Commission's investigation, as demonstrated below (Part II.A. *infra*), the Commission provided Platts with ample information for it to evaluate and concur as to the critical need for the subpoenaed information. While it is clear that Platts desires additional information as to the nature and scope of the Commission's investigation, Commission staff are not required to provide such additional information under the test articulated in *McGraw-Hill I* and *Whitney*. Nor can staff provide additional information to Platts about its investigation without running afoul of legal requirements to keep the nature and scope of the Commission's investigation confidential and non-public. *See* 17 C.F.R. § 11.3 (2006); 7 U.S.C. § 12(a). Commission staff will provide to this Court, *in camera*, or as otherwise directed, any additional information it may require to assist in ruling on this Application.

Second, McGraw-Hill contends that the Commission purportedly failed to demonstrate – again, to Platts' satisfaction -- that it has "exhausted" all attempts to obtain the information requested in the Subpoena from other reasonably available sources. Exhausting all available avenues to obtain the information is not efficient and increases the drain on government resources and tax payer dollars. Nevertheless, the Commission diligently attempted to find the

4

information from other sources. Furthermore, as demonstrated below, Platts can point to no other source, not fully exhausted by the Commission, that possesses the information requested.

Third, McGraw-Hill objects to the production of responsive documents without "execution of and 'so ordering' of a Protective Order[.]" [5] In light of that request and this Court's ruling in *Whitney*, the Commission agreed to work with McGraw-Hill to craft such a Protective Order and submitted to McGraw-Hill a draft proposed Protective Order (modeled in large part after the Protective Order entered by this Court in *Whitney*).[6] The Commission also requested McGraw-Hill's comments on the draft.[7] As discussed below, McGraw-Hill objected to certain paragraphs contained within the Commission's proposed draft. Unfortunately, resolution of those objections requires aid of this Court.

McGraw-Hill's refusal to produce all of the documents requested in the Subpoena is detrimentally impinging a federal government investigation of Energy Company. Despite the Commission's willingness to negotiate a reasonable Protective Order (*i.e.*, one that protects from public scrutiny McGraw-Hill's supposedly "privileged" information, while at the same time not impeding the Commission's statutorily-mandated law enforcement function), the government needs the Court's assistance to resolve this impasse. The Commission respectfully requests that the Court compel McGraw-Hill's full and complete compliance with the Subpoena so that the government can efficiently and effectively investigate this potential market manipulation.

---

[5]     *Banar Declaration*, ¶ 20 at Exhibit 7, p. 2.

[6]     *Id.*, ¶ 23 at Exhibit 8, and attachment A thereto.

[7]     *Id.*, ¶ 23 at Exhibit 8, p. 2.

## II.     FACTUAL BACKGROUND

### A.     The Commission

The Commission is an independent federal regulatory agency created by Congress to administer and enforce the CEA.  7 U.S.C. §§ 1 *et seq.*  In Section 3(a) of the CEA, Congress made clear that commodity transactions regulated under the CEA "are affected with a national public interest," as they, among other things, provide a means for risk management and price discovery.  7 U.S.C. § 5(a).  A core mission of the Commission is to protect the integrity of commodities markets, including the energy markets at issue here, through deterrence and prevention of price manipulation.  *Id.* at § 5(b) ("[t]o foster these public interests, . . . the purpose of [the CEA is] to deter and prevent price manipulation or any other disruptions to market integrity[.]")

Pursuant to its regulatory powers, the Commission is conducting a non-public investigation[8] of the Energy Company to determine whether it manipulated or attempted to manipulate the price of physical natural gas at certain natural gas delivery locations, including a specific delivery location, to benefit the company's financial trading positions (*i.e.* swaps) that were tied to a certain price index compiled and distributed nationally by Platt's *Inside FERC.*[9] The investigation is being conducted pursuant to a formal Order of investigation issued by the

---

[8]     Pursuant to 17 C.F.R. § 11.3 (2006), the investigation, and thus all information and documents obtained during the course of the investigation, are treated as non-public by the Commission and its staff "except to the extent that (1) the Commission directs or authorizes the public disclosure of the information; (2) the information or documents are made a matter of public record during the course of an adjudicatory proceeding; or (3) disclosure is required by the Freedom of Information Act, 5 U.S.C. 552, and the rules adopted by the Commission thereunder, 17 CFR Part 145."

[9]     *Banar Declaration.*, ¶¶ 7-18.

Commission on December 1, 2006 under Sections 6(c) and 8(a)(1) of the CEA, 7 U.S.C. §§ 5 and 12(a)(1).[10]

### B.     Platts' *Inside FERC* Index

Platts, a division of McGraw-Hill, compiles and sells to industry participants and others first-of-the-month ("FOM") natural gas index prices for more than 40 natural gas markets throughout the United States.[11]  The FOM index prices by *Inside FERC* are tied to particular natural gas delivery locations (or "hubs").  The index prices at issue here are the *Inside FERC* FOM natural gas prices calculated by Platts for delivery at the specific natural gas hub in question, as well as at other natural gas delivery hubs located in Texas and Louisiana.[12]

Platts calculates the FOM index price by surveying and collecting natural gas transaction data (including price, volume, and natural gas delivery location information) from natural gas market participants, including energy companies, from across the United States.[13]  The data submitted to Platts ostensibly represents the participants' (*e.g.*, traders, energy companies, etc.) actual natural gas transactions.  Platts then sells, circulates and disseminates these indices through various services, which are used by energy companies, public utilities, and speculators, among others, to price natural gas transactions, for price discovery, and to assess price risks.[14]

---

[10]     A copy of the Order is attached as Exhibit 1 to the *Banar Declaration.*

[11]     *See Banar Declaration,* ¶ 10 at Exhibit 2; ¶ 13 at Exhibit 3.  A "first-of-the-month" or "baseload" transaction refers to a natural gas trade that requires the seller to deliver physical natural gas to the buyer, ratably, over the course of the following month.  *Id.*, at ¶ 11.  In exchange, the seller is paid the index price for the gas.

[12]     *See id.,* ¶¶ 12-12.

[13]     Platts calculates the index price through *Inside FERC's* survey of market participants for their fixed-price, baseload deals negotiated during bid week (*i.e.*, the last week of the month) for delivery the next month (*i.e.*, the "prompt month").  *Banar Declaration,* ¶ 10 and Exhibit 2; ¶ 11.  The index price for a given delivery location as ultimately reported in *Inside FERC* reflects a weighted average of both reported price and volume.  *Id*  As noted above (*supra* n. 11), "baseload deals" refer to contracts calling for actual physical delivery of natural gas at a given delivery location for an entire month.

[14]     *Banar Declaration,* ¶¶ 10 at Exhibit 2; ¶¶ 27-28 and Exhibits 11-13.

Platts' indices thus have a financial impact upon billions of dollars worth of physical, financial, and futures natural gas transactions, and the utility rates paid by the consumers.[15] Notably, McGraw-Hill has publicly acknowledged that "some energy companies and individual traders have repeatedly attempted to manipulate the price indexes produced by publishers such as Platts."[16]

---

[15]    See id., ¶¶ 27-28 and Exhibits 11-13.

[16]    See id., ¶ 31 at Exhibit 17. See also the myriad of Commission actions filed against market participants for manipulating, attempting to manipulate, and/or false reporting prices of natural gas by submitting false information to index providers. In re Dynegy Marketing & Trade, et al., CFTC Docket No. 03-03 (CFTC filed Dec. 18, 2002) ($5 million civil monetary penalty); In re El Paso Merchant Energy, L.P., Docket No. 03-09 (CFTC filed March 26, 2003) ($20 million civil monetary penalty); In re WD Energy Services Inc., Docket No. 03-20 (CFTC filed July 28, 2003) ($20 million civil monetary penalty); In re Williams Energy Marketing And Trading, et al., Docket No. 03-21 (CFTC filed July 29, 2003) ($20 million civil monetary penalty); In re Enserco Energy, Inc., Docket No. 03-22 (CFTC filed July 31, 2003) ($3 million civil monetary penalty); In re Duke Energy Trading And Marketing, L.L.C., Docket No. 03-26 (CFTC filed Sept. 17, 2003) ($28 million civil monetary penalty); CFTC v. American Electric Power Company, Inc., et al., No. C2 03 891 (S.D. Ohio filed Sept. 30, 2003) ($30 million civil monetary penalty); In re CMS Marketing Services and Trading Company, et al., Docket No. 04-05 (CFTC filed Nov. 25, 2003) ($16 million civil monetary penalty); In re Reliant Energy Services, Inc., Docket No. 04-06 (CFTC filed Nov. 25, 2003) ($18 million civil monetary penalty); In re Aquila Merchant Services, Inc., Docket No. 04-08 (CFTC filed Jan. 28, 2004) ($26.5 million civil monetary penalty); In re Calpine Energy Services, L.P., CFTC Docket No. 04-11 (CFTC filed Jan. 28, 2004) ($1.5 million civil monetary penalty); In re ONEOK Energy Marketing And Trading Company, L.P., et al., Docket No. 04-09 (CFTC filed Jan. 28, 2004) ($3 million civil monetary penalty); In re Entergy-Koch Trading, LP, Docket No. 04-10 (CFTC filed Jan. 28, 2004) ($3 million civil monetary penalty); In re e prime, Inc., Docket No. 04-12 (CFTC filed Jan. 28, 2004) (a wholly-owned subsidiary of Xcel Energy, Inc.; $16 million civil monetary penalty); In re Western Gas Resources, Inc., Docket No. 04-17 (CFTC filed July 1, 2004) ($7 million civil monetary penalty); In re Coral Energy Resources, L.P., Docket No. 04-21 (CFTC filed July 28, 2004) ($30 million civil monetary penalty); In re BP Energy Co., Docket No. 05-02 (CFTC filed Nov. 4, 2004) ($100,000 civil monetary penalty); In re Cinergy, CFTC Docket No. 05-03 (CFTC filed November 16, 2004) ($3 million civil monetary penalty); In re Mirant, CFTC Docket No. 05-05 (CFTC filed Dec. 6, 2004) ($12.5 million civil monetary penalty); In re McKenna, CFTC Docket No. SD 05-03 (CFTC May 20, 2005) (registration revocation); In re Dominion Resources, Inc., CFTC Docket No. 06-06 (CFTC Sept. 27, 2006) ($4.25 million civil monetary penalty); CFTC v. Foley, No. 2:05 849 (S.D. Ohio filed Sept. 14, 2005, settled Sept. 28, 2006) ($350,000 civil monetary penalty); CFTC v. Atha, et al., No. 1:05-CV-0293 (N.D. Ga. filed Feb. 1, 2005, settled Nov. 17, 2006) (McDonald and Whalen total $550,000 civil monetary penalties; still pending against Atha); CFTC v. NRG Energy, Inc., No. 04-cv-3090 MJD/JGL (D. Minn. filed July 1, 2004) ($2 million civil monetary penalty); CFTC v. Reed, et al., No. 05-D-178 (D. Colo. filed Feb. 1, 2005, settled March 13, 2007) (Danyluk, Mclaughlin, and Concord Energy, LLC total $1.6 million civil monetary penalties; still pending against Reed); and CFTC v Richmond, No. 05-M-668 (OES) (D. Colo. filed April 12, 2005, settled March 20, 2007) ($60,000 civil monetary penalty).

C.    **The Division's Investigation of Energy Company**

During the course of this investigation, the Division has received documents, audiotapes of telephone conversations, and other information, including testimony of Energy Company employees, demonstrating that, during the time period August through December 2005, Energy Company's natural gas traders may have manipulated or attempted to manipulate the price of physical natural gas at particular natural gas delivery hubs, including the hub in question, to benefit Energy Company's financial positions tied to the *Inside FERC* index price for that specific hub.[17]  The Division is also investigating whether or not Energy Company engaged in similar misconduct during particular time periods in 2003, 2004, and 2006.[18]

As a result of its investigation of Energy Company, the Division has evidence that Energy Company voluntarily submitted information regarding Energy Company's physical natural gas baseload transactions ("trade data"), including price and volume information, to Platts for use in calculating the *Inside FERC* index, from approximately the spring of 2003 through the present time.[19]  The Commission also has evidence that Energy Company knew that the trade data it submitted to Platts could be used in Platts' calculation of the *Inside FERC* index,

---

[17]      *See Banar Declaration*, ¶¶ 2-4, 7-18.  In the natural gas market, there are "basis" relationships between various trading hubs.  Basis refers to the difference in the price of physical natural gas traded at different locations, *e g.*, between trading hubs in eastern Texas and trading hubs in western Texas.  *Id.*, ¶ 8. Natural gas participants trade these price differentials -- in particular, the differential between the Henry Hub (located in Louisiana) and other major trading points -- via swaps.  Swaps are financial contracts that can be designed and structured as follows:  the buyer and seller of the swap exchange payment streams with the buyer paying the seller the New York Mercantile Exchange ("NYMEX") (futures contract) final settlement price ± a differential, and the seller paying the buyer the monthly baseload (or FOM) index price generated by Platts' *Inside FERC* for a given location.  Traders execute basis swaps to hedge price risk, to trade for speculative purposes, or both.  *Id.*, ¶ 9.

It follows, therefore, that where the purpose of the swap is speculative, the buyer is betting that the price differential between the Henry Hub and another location will narrow, *i.e.*, either the *Inside FERC* index price he receives posts higher or the NYMEX final settlement price he pays posts lower.  Conversely, the seller of a basis swap would want the *Inside FERC* index price to drop and the NYMEX price to rise.  As such, a seller of a basis swap hopes that the price differential will widen.

[18]      *Banar Declaration*, ¶ 7.

[19]      *Id.*, ¶ 12 at Exhibit 3; ¶¶ 14, 16 and Exhibit 4; and ¶ 18.

that its trade data could impact Platts' calculation of the price index, and that that impact could in turn impact the profitability of Energy Company's financial positions tied to the index.[20]

There are only two sources for the trade data information the Commission seeks: the Energy Company and McGraw-Hill. However, there is only *one* source – *i.e.*, Platts – for documents reflecting what trade data was used and how it was used by Platts to calculate the *Inside FERC* index. The index is used to price natural gas contracts and ultimately impacts what certain consumers will pay for natural gas.

As outlined in the accompanying Banar Declaration, the Commission has exhausted all attempts to obtain the universe of the trade data submitted by Energy Company to Platts from Energy Company itself.[21] From the information received, however, the Commission is unable to confirm the universe of the trade data the Energy Company submitted to Platts, its receipt by Platts, or how Platts used the trade data to compile its indexes.[22]

---

[20]     *Id.*, ¶ 18.

[21]     *Id.*, ¶ 14; 16 and Exhibit 4; ¶ 18; ¶ 30 at Exhibit 16.

[22]     Because of these deficiencies, the Commission requested that Energy Company submit to Platts a letter requesting that Platts release to the Commission all of the reports it submitted to Platts during the time period in question, waiving any possible claim that Platts may make that the information submitted by Energy Company is "confidential" source information. Energy Company transmitted that letter on February 19, 2007. *Banar Declaration*, ¶ 26 and Exhibit 10.

        On information and belief, Platts may have obtained trade data relating to Energy Company for use in calculating the *Inside FERC* FOM index from an electronic trading platform. Thus, as part of its exhaustion efforts, the Commission obtained, from the electronic trading platform the Intercontinental Exchange ("ICE"), all baseload transaction data relating to Energy Company for the time period under investigation. *Banar Declaration*, ¶ 15. However, absent receipt of the information requested in the Subpoena from Platts, there is no way for the Commission to certify whether this data is the universe of trade data utilized by Platts in calculating the index.



### D.    The Commission's December 15, 2006 Subpoena to McGraw-Hill Concerning the Energy Company

Pursuant to its investigative authority, the Commission served the Subpoena on McGraw-Hill on December 15, 2006, seeking, *inter alia*, production of trade data the Energy Company submitted to Platts, and documents concerning Platts' use of that data in calculating the *Inside FERC* FOM index.[23]  Commission staff drafted the Subpoena to ensure that the requested documents included only those documents that this Court held in *McGraw-Hill I* and in *Whitney* are subject to production, *i.e.*, Energy Company's transaction data;[24]  Platts' reporting instructions to the industry;[25] Platts' methodology for calculating the index;[26] the spreadsheets;[27] and complaints from market participants regarding false reporting or attempts to manipulate the price of natural gas.[28]

On January 12, 2007, McGraw-Hill served on Commission staff its responses and objections to the Subpoena, claiming that Document Requests Nos. 1, 2, 4 and 6 are subject to

---

[23]    Copies of the Subpoena and McGraw-Hill's Objections to the Subpoena are attached, respectively, as Exhibits 6 and 7 to *Banar Declaration*.

[24]    *See, id.,* at Exhibit 6, Document Request No. 1 ("all documents received by" Platts from Energy Company containing "price, volume or delivery location of any natural gas baseload transactions" for certain delivery locations.")

[25]    *See, id.*, Document Request No. 2.

[26]    *See, id.*, Document Request No. 3.

[27]    *See; id.*, Document Request No. 4 (all "documents reflecting, referencing or implementing the formulas used to calculate index prices" for those delivery locations at which Energy Company submitted price and volume information).

[28]    *See, id.*, Document Request No. 6.

the reporters' privilege.[29]  McGraw-Hill claimed that Request No. 3 also is "privileged," but has failed to identify the privilege.[30]

Thereafter, in an attempt to eliminate or at least narrow any dispute between the parties regarding the subpoenaed documents or the manner of their production prior to seeking aid of this Court, counsel for the Commission and counsel for McGraw-Hill engaged in substantive discussions on a number of occasions in an attempt to minimize the burden on McGraw-Hill without compromising the Commission's investigation.[31]  In those discussions, McGraw-Hill maintained that the Commission purportedly had failed to satisfy Platts that the information requested in the Subpoena "goes to the heart" of the Commission's investigation, and that the Commission purportedly had also failed to satisfy Platts that it had exhausted all other reasonably available alternative sources of obtaining the information prior to issuing the Subpoena.  McGraw-Hill also refused to produce any documents unless and until the Commission agrees to the issuance of a Protective Order.

In response, Commission staff agreed to work with McGraw-Hill to craft an appropriate Protective Order, submitted to McGraw-Hill a draft proposed Protective Order (modeled in large part after the Protective Order entered by this Court in *Whitney*), and requested comments on the

---

[29]     *See Banar Declaration,* ¶ 20 at Exhibit 7.

[30]     *Id.*  McGraw-Hill also objected to Document Request No. 5 – which requested "published natural gas baseload prices " for the hub in question. but subsequently produced the requested documents to the Commission.

[31]     *See generally, id.,* ¶¶ 20-25.  In *McGraw-Hill I*, Platts belatedly filed a motion for issuance of a protective order, which the Court denied on grounds that the motion was not timely filed.  Nonetheless, the court encouraged in the context of that subpoena-enforcement action "the parties to continue to work together in good faith toward the common goal of protecting the public interest in truthful news reporting."  *CFTC v. The McGraw-Hill Companies, Inc*, Misc. No. 05-235 (RCL), slip op. at 7-8, (D.D.C. December 2, 2005)  (Lamberth, J.).

draft.[32]  Platts has objected to certain paragraphs contained within the Commission's proposed

draft.[33]

In addition, Commission staff explained to McGraw-Hill's counsel its need for the

information requested in the Subpoena.  Specifically, staff explained:  (i) that it is investigating

the Energy Company for, among other things, possible violations of the anti-manipulation

provision of Section 9(a)(2) of the CEA; (ii) the elements of price manipulation and the

definition of an "artificial price"; and (iii) that any company that calculates and publishes market

prices, like the *Inside FERC* index at issue here, can become the vehicle for furthering a

manipulation scheme if that company uses manipulated – *i.e.*, artificial -- prices supplied by a

market participant, such as the Energy Company, to calculate the published (index) price.[34]

Commission staff also advised McGraw-Hill's counsel that, prior to issuing the

Subpoena, it had attempted to obtain directly from Energy Company the trade data it submitted

to Platts for use in calculating the *Inside FERC* index, and that, nevertheless, "Platts is the *sole*

*source* of what data was used, and how it was used, to calculate the index."[35]  Finally,

Commission staff advised:

> "[W]hile Platts may desire additional information as to the nature and scope of the
> Division's investigation, the Division cannot provide it – at least not in this setting
> – without running afoul of its statutory obligations to keep the nature and scope of
> its investigation confidential and non-public.  The Division will, however, provide

---

[32]     *Id.*, ¶ 23 at Exhibit 8, p. 2.  In the spirit of cooperation, but without conceding that any such action is either
required or necessary in the context of this investigative Subpoena, Commission staff also agreed, in the first
instance only, to permit McGraw-Hill to redact from its spreadsheets the identity of counterparties and companies
other than Energy Company.  *Id.* at ¶ 22.  However, this is also critical evidence.

[33]     *Id.*, ¶ 24 at Exhibit 9.

[34]     *Id*, ¶ 25.

[35]     *Id.*, ¶ 23 at Exhibit 8.

any additional information that the Court may require on this point, under seal of the Court."[36]

## III.    ARGUMENT

Pursuant to a formal Order of investigation,[37] the Commission is investigating whether or not Energy Company manipulated or attempted to manipulate the price of natural gas in interstate commerce in violation of Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2).  The Commission is also investigating whether Energy Company's reported transactions were used by Platts in calculating the *Inside FERC* index, thereby infecting that index with manipulated prices to the benefit of Energy Company and potentially impacting other market participants that price physical and financial natural gas contracts off of the index.[38]

As a federal regulatory agency "pursuing an enforcement matter," the Commission's investigation is "presumed to be undertaken in the public interest."  *McGraw-Hill I*, 390 F. Supp.2d at 33 (noting that the "price manipulation provisions of the CEA are . . . designed to protect the public"); *see also* 7 U.S.C. § 5(a) (the regulation of commodity transactions is a matter of "national public interest.").  Thus, the "scope and authority" of the Commission to investigate violations of the CEA is "more similar to that of a grand jury" in a criminal case "than a purely civil matter."  *Id.* (citing, *e.g.*, *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 947 (D.C. Cir. 1994)); *see also, Whitney*, 441 F.Supp.2d at 65 (actions "initiated by the CFTC reflect

---

[36]    *Id.* Consequently, the Commission comes before this Court for the *third* time to enforce a subpoena requesting the precise same documents, for essentially the same purpose, as requested in *McGraw-Hill I* and *Whitney*, with McGraw-Hill once again claiming that the Commission has not provided sufficient details of its non-public investigation to satisfy to Platts that the Commission's need for the information goes to the heart of its investigation, and the Commission once again responding that providing further details of a confidential, non-public investigation is prohibited by the very federal laws it seeks to enforce.  Platts wants to decide which evidence will be withheld.  Platts wants essentially to play an umpire role by attempting to determine which balls are in the strike zone.

[37]    *Id.*, ¶ 4 at Exhibit 1.

[38]    In this investigation, the Commission has no reason to believe that Platts knew it could be including manipulated prices in its index calculation.

14

a greater public interest" than a private right of action "insofar as they involve a federal agency seeking to enforce laws designed to protect the public.").

Given these principles, this Court in *McGraw-Hill I* held that any "reporter's privilege" claimed by Platts in response to a Commission subpoena was a "qualified" privilege that could be overcome by a showing that: (i) the information sought goes to the "heart of the matter" and (ii) the Commission has exhausted all reasonably available alternatives sources of obtaining the information. *Id.* at 34 (citing the balancing test set forth in *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981)); *see also, Tripp v. Dep't. of Defense*, 284 F. Supp.2d 50, 59 (D.D.C. 2003).[39] As demonstrated below, and as this Court has *twice* now held, based on almost identical issues and facts, the balancing test set forth in *Zerilli* weighs in favor of abrogating the privilege, and the documents requested in the Subpoena must be produced.

### A.     The Information Requested Goes to the Heart of the Commission's Investigation Under Section 9(a)(2) of the CEA

"To manipulate prices means . . . to cause prices to go up or down by means directed to either such end or to prevent prices from going up or down by means directed to either such end." *In re Henner*, 30 A.D. 1151, 1235 (Agric. Dec. 1971) (attached hereto). "Nevertheless, the means of manipulation 'are limited only by the ingenuity of man.'" *CFTC v. Enron Corp.*, 2004 WL 594752 at *4 (S.D. Tex. March 10, 2004) (*quoting Cargill Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir. 1971)). When investigating possible price manipulation under Section 9(a)(2) of the CEA, the Division must evaluate four factors: (i) whether Energy Company had the ability to influence prices; (ii) whether Energy Company specifically intended to create an artificial price; (iii) whether an artificial price existed; and (iv) causation. *See In re Soybean*

---

[39]     "[W]hile the strong preference for abrogation [of the privilege] used in criminal cases does not apply here, the posture of this matter calls for a more qualified view of the privilege than would be appropriate in a purely civil case." *McGraw-Hill I*, 390 F. Supp.2d at 33.

*Futures Litigation*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) (citing *Frey v. CFTC*, 931 F.2d

1171, 1173-78 (7th Cir. 1991). An "artificial price" is a price that does not reflect the legitimate

forces of supply and demand. *See In re Indiana Farm Bureau Cooperative*, 1982 WL 30249,

*35 n. 2 (CFTC 1982); *see also, In re Soybean*, 892 F. Supp. at 1053, n. 28 ("a price is said to be

'artificial' or 'distorted' if it 'does not reflect the market or economic forces of supply and

demand' operating upon it." (internal citation omitted)); *cf. Frey*, 931 F.2d 1171, 1174

("Manipulation, broadly stated, is an intentional exaction of a price determined by forces other

than supply and demand.").[40]

The Division has evidence demonstrating that Energy Company's natural gas traders may

have manipulated or attempted to manipulate[41] the price of natural gas at certain natural gas

delivery hubs, including the specific hub in question, to benefit Energy Company's financial

positions (*i.e.*, swaps) tied to the *Inside FERC* index price for that hub[42] during the fall of

2005.[43] In other words, the Division has evidence that Energy Company created (or attempted to

create) artificial prices for baseload natural gas at certain natural gas delivery locations, knowing

that if this trade data was used by Platts to calculate the *Inside FERC* index, it could impact that

---

[40] *See also, In re Abrams*, 1994 WL 506250, * 10 (CFTC 1994) (to prove manipulation, "[a] market participant must have acted with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand . . . . " (internal quotations omitted)); *Cargill*, 452 F.2d at 1163 ("The aim must be . . . to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect the basic forces of supply and demand.").

[41] The elements of an attempted manipulation under Section 9(a)(2) of the CEA are: (i) specific intent to affect the market price; and (ii) some overt act in furtherance of that intent. *See CFTC v. Atha, et al.*, 2006 WL 687728, *6 (N.D. Ga. 2006) (citing *In re Hohenberg Bros Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977)).

[42] See, *supra* n. 17, explaining financial basis swaps.

[43] The Division also is investigating whether Energy Company engaged in similar misconduct in 2003, 2004 and 2006. *Banar Declaration*, ¶ 7. "The Supreme Court has made clear that [a federal] agency's investigatory authority is far-reaching, analogous to that of a grand jury, which can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Resolution Trust*, 18 F.3d at 947 (quoting *U.S. v. Morton Salt Co*, 338 U.S. 632, 642-3 (1950)).

16

index price in a way favorable to benefit Energy Company's swaps that were tied to the index. The Division must confirm, however, that Energy Company reported the trade data containing the suspected manipulated prices to Platts; whether Platts included Energy Company's trade data in its calculation of the *Inside FERC* index; and, if it did, how Energy Company's trade data affected or impacted the *Inside FERC* index (*i.e.*, whether Energy Company's trade data distorted the index price).

Accordingly, the Commission issued the Subpoena requesting the following categories of documents: (i) the trade data Energy Company submitted or caused to be submitted to Platts; (ii) the instructions Platts provided to market participants of what trade data to report and how to report it for use in calculating the index; (iii) the spreadsheets Platts used to compile the trade data from market participants; and (iv) documents reflecting how Platts used that data to calculate the *Inside FERC* index.  These categories of documents go to the heart of the Commission's investigation into possible price manipulation for three reasons.

Energy Company's trade data, spreadsheets, and documents reflecting what data Platts used to calculate the index and how it calculated the index are essential to prove two elements of a completed manipulation: "ability to influence prices" and "causation."  As this Court held in *McGraw-Hill I*, to determine whether Energy Company's trade data "actually did affect prices, or had the potential to do so," the Commission needs to know what trade data Energy Company submitted to Platts and "how Platts transformed the raw data from companies such as Energy Company into its published indices."  390 F. Supp.2d at 34; *see also, Whitney*, 441 F. Supp.2d at 68 ("If the CFTC cannot determine what information was submitted . . . or cannot ascertain how that information was used by Platts to generate its index prices, it may be unable to determine the potential and actual effects" on market prices).

17

Moreover, this precise same information goes to the element of price artificiality, *i.e.*, whether Energy Company's manipulated transaction data infected, or distorted, the *Inside FERC* index. *See, Indiana Farm Bureau*, 1982 WL 30249, at *35 n. 2. ("when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial. *** [Thus] the focus should not be as much on the ultimate price, as on the nature of the factors causing it."); *cf.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (explaining in the antitrust context that "market manipulation in its various manifestations is implicitly an artificial stimulus applied to . . . market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone.").

Finally, Energy Company's submission of trade data to Platts, in accordance with Platts' instructions and knowing that Platts could use that data in calculating the *Inside FERC* index, goes to the element of "intent" to create an artificial price. *Cf., Whitney*, 441 F. Supp.2d at 67 ("proof . . . of knowledge is crucial to the CFTC's case"). As demonstrated above, the Division has evidence that Energy Company routinely reported baseload natural gas transactions to *Inside FERC* for use in calculating the FOM index.

Accordingly, where, as here and in *McGraw-Hill I*, "the information" requested in the Subpoena "is crucial to the plaintiff's proof, the balance tilts in favor of disclosure," *McGraw-Hill I*, 390 F. Supp. 2d at 34 (citing *Zerilli*, 656 F.2d at 713), and the documents must be produced.[44]

---

[44]    Indeed, the only difference between the investigation in *McGraw-Hill I* (and the litigation in *Whitney*) and the investigation in this case is that in the former cases the Commission was investigating (or litigating) whether or not the energy companies had submitted false trade data to Platts in an attempt to skew the *Inside FERC* index to benefit the energy company's trading positions. There is no substantive difference, however, between infecting the *Inside FERC* index with "false" price or volume information in an effort to skew that index (*e.g., McGraw-Hill I* and *Whitney*), and infecting the index with manipulated – *i.e.*, "artificial" – prices in an effort to skew that index (*e.g.*, this case). *Cf. Enron Corp.*, 2004 WL 594752 at *4 ("Buying or selling in a manner calculated to produce the maximum effect on prices, frequently in a concentrated fashion and in relatively large lots is one form of manipulation, among others." (*citing In re Henner*, 30 A.D. at 1227)).

B.     **The Commission Has Exhausted Other Reasonably Available Sources of the**
       **Information**

Under *Zerilli* and its progeny, the exhaustion of alternative sources "requires only that all

'reasonable' sources of evidence be tapped. It does not require proof positive that the knowledge

exists no where else on earth but in the minds of the journalists and their anonymous confidants."

*Lee v. Department of Justice*, 287 F. Supp.2d 15, 23. (D.D.C. 2003). Moreover, where the

journalist appears to be the only one with access to information relevant to the case, courts in this

jurisdiction have compelled disclosure. *See Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1972),

*cert. dismissed,* 417 U.S. 938 (1974) (a party is not required to engage in "wide-ranging and

onerous discovery burdens where the path is…ill-lighted."). This is even the case where an

independent federal regulatory agency like the Commission seeks to examine the reportorial and

editorial process of a journalist. *See National Labor Relations Board v. Mortensen*, 701 F. Supp.

244 (D.D.C. 1988).

As was the case in *McGraw-Hill I* and *Whitney*, the Commission now reaches out to

McGraw-Hill for information only after having exhausted every reasonable alternative source of

the information -- to the extent one exists. With respect to the actual reports the Energy

Company submitted or caused to be submitted to Platts and any instructions Platts provided to

the Energy Company, the Commission has sought this information directly from Energy

Company, and Energy Company has produced the responsive documents still in its possession.[45]

However, as set forth in the accompanying *Banar Declaration*, there is a strong basis to believe

that Energy Company no longer possesses the universe of documents that were exchanged

between it and Platts. For example, Energy Company has advised the Commission that two

---

[45]     *Banar Declaration,* ¶ 16 at Exhibit 4; ¶ 30 at Exhibit 16.

19

offices of the company reported price information to *Inside FERC*, but that records are available

from one office only beginning April 2005, and that that office purportedly did not report trade

data in September 2005.[46]  The Commission needs to test this assertion.  Moreover, many of the

reports received from Energy Company contain incomplete information, *e.g.*, the reports include

the month and day the trades were executed, but not the year the trades were executed.[47]  Thus,

the only plausible alternative source of the information is the party in receipt of the reports

submitted by Energy Company, *i.e.* Platts.  *See Whitney*, 441 F. Supp.2d at 69.

      With regard to the spreadsheets Platts used to calculate its index prices, McGraw-Hill is

the sole source of information concerning whether it used the Energy Company's trade data and,

if so, to what extent it used this information.  *Id.*  Given this fact, it would appear that only

McGraw-Hill's information can confirm whether trades reported by the Energy Company caused

or contributed to artificial prices.

      This Court previously addressed this same issue in *McGraw-Hill I*, which again involved

the same categories of information.  There, the Court concluded that, other than McGraw-Hill

and the company that reported the information to Platts, "there exists no other reasonably

available source for the information."  *The McGraw-Hill Companies, Inc.*, 390 F. Supp.2d at 35.

The Court found that the Commission, having gone to the company, and in response received

less than the full universe of documents, demonstrated a sufficient exhaustion of other sources

under *Zerilli*.  *Id.*[48]

---

[46]    *Id.*, ¶ 16 at Exhibit 4.

[47]    *See, e.g., id.*, ¶ 17 and Exhibit 5.

[48]    The Subpoena also requests any complaints received by Platts from market participants relating to price manipulation and false reporting.  The Court in *McGraw-Hill I* ordered these documents produced.  390 F. Supp.2d at 35-38.

## IV.    PROPOSED PROTECTIVE ORDER

McGraw-Hill has objected to the production of responsive documents without "execution of and 'so ordering' of a Protective Order[.]"[49]  The Commission has attempted in good faith to negotiate the terms of a Protective Order that protects from public scrutiny the supposedly "privileged" documents while not impeding or compromising the Commission's statutorily-mandated law enforcement function.  To that end, the Commission submitted to McGraw-Hill a draft proposed Protective Order, and requested comments on the draft.[50]  The proposed Protective Order was modeled in large part after the Protective Order entered by this Court in *Whitney*, but also added the following.

First, while the proposed Protective Order limits the Commission's dissemination of the "McGraw-Hill Documents"[51] "to its Commissioners, its attorneys, its employees, its experts or consultants, and its witnesses,"[52] it also provides that the Commission may, without prior notice to Platts, "disclose, grant access to, and transmit the McGraw-Hill Documents to any Federal or State department, agency, or other entity identified in Section 8(e) of the [CEA] that is acting within the scope of its jurisdiction."[53]  See 7 U.S.C. § 12(e).  Paragraph 4 provides, however, that any such person or entity granted access to the documents,

> ***shall be*** provided with a copy of this Protective Order prior to receipt of the McGraw-Hill Documents; ***shall be*** advised that the documents are being disclosed pursuant to and subject to the terms of this Protective

---

[49]    *Id.,* ¶ 25 and Exhibit 7, p. 2.

[50]    *Id.,* ¶ 23 at Exhibit 8 and attachment A thereto.

[51]    The "McGraw-Hill Documents" are defined in Paragraph and 5 of the proposed Protective Order to include only those documents held by this Court in *McGraw-Hill I* to fall within the scope of the qualified privilege.  *Id.*

[52]    *Id.,* ¶ 17 at Exhibit 8 at Attachment A thereto at ¶ 2.

[53]    *Id.,* ¶ 17 at Exhibit 8 at Attachment A thereto at ¶ 3.

21

Order; and **shall be** advised that the documents may not be disclosed or used other than in accordance with this Protective Order.

(Emphasis supplied).[54]  These paragraphs, collectively, fully protect from public scrutiny all McGraw-Hill Documents produced pursuant to the Subpoena while recognizing the Commission's statutory right to share the information with other State or Federal law enforcement agencies acting within the scope of their jurisdiction.[55]

McGraw-Hill objects to these provisions, however, claiming that the Division must provide it "notice" prior to granting access to any other law enforcement agency under Section 8(e) of the CEA, ostensibly to ensure that the agency requesting access has met the two-prong *Zerilli* test prior to receiving the documents.[56]  McGraw-Hill claims that not providing them such notice purportedly runs afoul of the Court's decision in *Whitney* that "[s]ince documents protected by the reporter's privilege are ordered to be disclosed only when the balancing test is satisfied, any subsequent disclosure of the documents must necessarily be on condition that the balancing test is also met in the particular case."  441 F. Supp.2d at 72.[57]

---

[54]      *Id.*

[55]      In addition, in *any* non-public investigation conducted by the Commission, like the investigation at issue here, the Division requires the law enforcement agencies seeking access to documents or other information pursuant to Section 8(e) of the CEA to agree to:  (i) "make no public use of these files or information without prior approval of [Division] staff;" (ii) "notify [Division staff] of any legally enforceable demand for the files or information before complying with such a demand;" (iii) "assert such legal exemptions or privileges on [the Division's] behalf as [the Division] may request;" and (iv) "not grant any other demand or request for the files or information absent prior notice to, and a lack of objection by, [Division] staff."  *See Banar Declaration*, ¶ 29 and Exhibit 14.  In granting the access request, the Division further advises the requesting agency:

> "In all instances in which access to our files is granted to federal [or state] agencies or authorities, information furnished by the Commission shall not be disclosed by such agency or authority to any other person, except in connection with an action or proceeding under the laws of the United States to which the Commission, the United States, or that agency or authority is a party.  This limitation is imposed by Section 8(e) of the Commodity Exchange Act, 7 U.S.C. §12(e)."

*Id.*, ¶ 29 at Exhibit 15.

[56]      *Id.*, ¶ 24 at Exhibit 8.

[57]      *Id.*

22

*Whitney* did not involve an administrative subpoena, like the Subpoena at issue here, issued during the course of a non-public Commission investigation whose nature and scope is required to be kept confidential. *See* 17 C.F.R. § 11.3 (2006).[58] Nevertheless, the Commission is required to satisfy this Court that it is entitled to the documents under the test articulated in *Zerilli* and *McGraw-Hill I.* Once the Commission has done so, however, McGraw-Hill should not be entitled to know the subsequent course or direction of the Government's investigation.

Nor is "notice" to McGraw-Hill of the identity of other agencies seeking access to the information necessary for this Court to determine whether disclosure to the agencies is justified under *Zerilli*. The *Zerilli* test may be satisfied by either the Commission, or the governmental agency seeking access to the documents, providing a detailed explanation to this Court -- *ex parte*, for this Court's *in camera* review -- of the other agency's need for the information and its exhaustion efforts.

Second, the proposed Protective Order provides that upon the filing of an administrative or injunctive complaint, the proposed Protective Order becomes "null and void."[59] McGraw-Hill objects to this provision as well.[60] Nonetheless, as the Government is not permitted to file secret complaints, or to conduct secret trials, the provision is necessary. Once a complaint has been filed, McGraw-Hill will have ample time to file with the appropriate court or administrative agency a motion seeking a protective order applicable to the litigation at issue.

---

[58] Rather, the subpoena in *Whitney* was issued during the course of public litigation, pursuant to Rule 45, Fed. R. Civ. P.

[59] *Id.*, ¶ 23 at Exhibit 8 at Attachment A thereto at ¶ 12.

[60] *Id.*, ¶ 24 at Exhibit 9, p. 4.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, this Court should issue an order to show cause,

requiring McGraw-Hill to appear and demonstrate why an order should not be entered

compelling it to comply fully with the Subpoena issued by the Commission.  Because no good

cause can be shown, this Court should order McGraw-Hill to comply immediately in all respects

with the Commission's Subpoena.

Dated: April 30, 2007                                      Respectfully submitted,
Washington, D.C.


Kathleen M. Banar (Ill. Bar No. 6200597)
Kim Bruno (D.C. Bar No. 389899)
United States Commodity Futures
Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
202.418.5000
202.418.5531 (facsimile)

minimal24

## CERTIFICATE OF SERVICE

I, Kathleen M. Banar, hereby certify that on April 30, 2007 I caused a copy of *Applicant's Memorandum of Points and Authorities in Support of an Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena* to be served by Federal Express on counsel for The McGraw-Hill Companies, Inc., Carolyn K. Foley, Esq., Davis Wright Tremaine LLP, 1633 Broadway, New York, New York 10019.

_____
Kathleen M. Banar

25